UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

ANGELA WHEELER KENNERSON                CIVIL ACTION NO. 6:18-cv-01344

VERSUS                                  JUDGE JUNEAU

U.S. COMMISSIONER,                      MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action.

## Administrative Proceedings

The claimant, Angela Wheeler Kennerson, fully exhausted her administrative remedies before filing this action. She filed an application for disability insurance benefits, alleging disability beginning on October 22, 2015.[1] Her application was denied.[2] She then requested a hearing, which was held on March 5, 2018 before

---

[1]     Rec. Doc. 11-1 at 218.

[2]     Rec. Doc. 11-1 at 141.

Administrative Law Judge Holly Hansen.[3]  The ALJ issued a decision on May 8, 2018, concluding that the claimant was not disabled within the meaning of the Social Security Act from the alleged disability onset date through the date of the decision.[4]  The claimant asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[5]  Therefore, the ALJ's decision became the Commissioner's final decision for the purpose of the Court's review.[6]  The claimant then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

The claimant was born on July 26, 1968.[7]  At the time of the ALJ's decision, she was 49 years old.  She graduated from high school and obtained an associate's degree in accounting.[8]  She was in the United States Army from November 1996 through November 2000, serving as a supply specialist.[9]  She also has work experience as a bank teller and a commercial truck driver.[10]  She alleged that she has

---

[3]      A transcript of the hearing is found in the record at Rec. Doc. 11-1 at 93-122.

[4]      Rec. Doc. 11-1 at 65-77.

[5]      Rec. Doc. 11-1 at 5.

[6]      *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]      Rec. Doc. 11-1 at 599.

[8]      Rec. Doc. 11-1 at 107, 248.

[9]      Rec. Doc. 11-1 at 224, 274.

[10]      Rec. Doc. 11-1 at 107-109, 274.

2

been disabled since October 2015 due to tinnitus, major depressive disorder, panic disorder, agoraphobia, generalized anxiety disorder, gastroesophageal reflux disease, hypertension, right ankle condition, degenerative arthritis of the spine, sleep apnea, endometriosis with blocked right fallopian tube, and infertility.[11]

According to the evidence in the record, the claimant primarily receives her medical care at the Veterans Administration clinic ("the VA") in Alexandria, Louisiana.

On April 8, 2015, the VA reclassified the claimant's major depressive disorder, panic disorder, agoraphobia, and generalized anxiety disorder, which had previously been determined to be 70% disabling, as 100% disabling.[12]

Soft tissue swelling of the claimant's left ankle was evaluated on October 26, 2015 at the VA.[13] That same day, the claimant had a hearing aid examination of both ears, based on a diagnosis of sensorineural hearing loss, bilateral.[14]

Due to a history of endometriosis, an ultrasound evaluation of the claimant's uterus and ovaries was performed on November 4, 2015 at the VA.[15] She also

---

[11]    Rec. Doc. 11-1 at 247.

[12]    Rec. Doc. 11-1 at 207-209, 224-227.

[13]    Rec. Doc. 11-1 at 386.

[14]    Rec. Doc. 11-1 at 324.

[15]    Rec. Doc. 11-1 at 385-386.

3

received nutritional counseling on that date,[16] met with psychologist Dr. Julia D. Lott for sixty minutes of psychotherapy,[17] met with physician's assistant Hazel J. Alviar for diagnostic evaluation and medication management of her mental health issues,[18] and saw Dr. Lelia Ruth Angel for endometriosis.[19]

On November 5 and 6, 2015, the claimant was evaluated in the suicide prevention clinic at the VA and was diagnosed with "other depressive episodes."[20]

On November 23, 2015, the claimant was seen at the VA for fitting and adjusting of hearing aids, for nutritional counseling, and she also had an appointment with psychologist Dr. Lott for psychotherapy in connection with her depression.[21]

On November 27, 2015, the claimant went back to the VA for management of her CPAP machine.[22]

On December 14, 2015, the claimant again saw psychologist Dr. Lott for psychotherapy for her depression and she also received nutritional counseling.[23]

---

[16]    Rec. Doc. 11-1 at 322.

[17]    Rec. Doc. 11-1 at 323.

[18]    Rec. Doc. 11-1 at 323.

[19]    Rec. Doc. 11-1 at 323.

[20]    Rec. Doc. 11-1 at 322.

[21]    Rec. Doc. 11-1 at 321-322.

[22]    Rec. Doc. 11-1 at 321.

[23]    Rec. Doc. 11-1 at 321.

An MRI of the claimant's pelvis was obtained on December 21, 2015, which showed fibroid tumors in the uterus, mild endometrial hyperplasia, and multiple Nabothian cysts in the cervix.[24]

On January 12, 2016, the claimant received nutritional counseling, and she saw psychologist Dr. Lott for psychotherapy related to her depression.[25]

On January 26, 2016,[26] the claimant was seen at the VA for sleep-related hypoventilation.  She also saw physician's assistant Hazel J. Alviar for evaluation and medication management of her mental health issues, and she saw Dr. Angel for treatment of hypertension.

On February 10, 2016, the claimant again saw psychologist Dr. Lott for psychotherapy.[27]  It was noted that the claimant's sleep had improved with increased activity and that she exhibited a pattern of negative thought and avoidance behavior. The then-current diagnosis was unspecified depression.  That same day, she was also seen by a counselor in the VA's Move program for weight management.[28]  She also saw Ms. Alviar with regard to medication she was taking for her mental health

---

[24]     Rec. Doc. 11-1 at 384-385.

[25]     Rec. Doc. 11-1 at 320-321.

[26]     Rec. Doc. 11-1 at 319-320.

[27]     Rec. Doc. 11-1 at 375-377.

[28]     Rec. Doc. 11-1 at 373-374.

issues.[29]    The claimant had tapered off Xanax but was still feeling anxious and having panic attacks.    The claimant was described as morbidly obese, clean, appropriately groomed, and pleasant, with a normal gait.  She reported her mood as "still anxious."  Her affect was full in range, congruent, and appropriate to topics. Her thought process was goal-directed and tight, no delusions were revealed or observed, and she denied suicidal ideation, homicidal ideation, and perceptual disturbances.  The plan was to continue Buproprion for depression, low energy, and anhedonia; continue Mirtazapine for sleep and anxiety; start Hydroxyzine for anxiety/panic; and continue therapy with Dr. Lott.  It was noted that Hydroxyzine causes drowsiness and the claimant should not drive while taking it.  She was also counseled that Mirtazapine causes weight gain.  In addition to those medications, the claimant was also taking Amlodipine Besylate for blood pressure and heart, folic acid for vitamin supplement, Naproxen for joint pain, polyethylene glycol for irritable bowel syndrome, and Zolpidem Tartrate for sleep.

On February 24, 2016, a respiratory therapist at the VA educated the claimant on the use of a CPAP machine.[30]

---

[29]    Rec. Doc. 11-1 at 369-373.

[30]    Rec. Doc. 11-1 at 367-369.

On March 2, 2016, the claimant was counseled by a dietician in the VA's weight management program.[31]  That same day, she also met with Dr. Lott for psychotherapy.[32]  Her diagnosis remained unspecified depression.  Dr. Lott noted a regression in the claimant's treatment gains in terms of sleep but an improvement in the claimant's ability to recognize unrealistic thoughts and realistic alternatives.  The claimant was also seen in the urgent care clinic at the VA on that same date for conditions unrelated to her claimed disability.[33]

The claimant returned to the weight management program on March 17, 2016.[34]  She was also seen by Dr. Lott for psychotherapy in connection with her unspecified depression.[35]  She was also treated for endometriosis on that date.[36]

The claimant's feet were imaged on March 23, 2016 at the VA.[37]  That same day, the claimant saw Ms. Alviar for mental health medication management.[38]  The claimant reported that her anxiety had improved but she was still having problems

---

[31]     Rec. Doc. 11-1 at 359-363.

[32]     Rec. Doc. 11-1 at 357-359.

[33]     Rec. Doc. 11-1 at 352-357.

[34]     Rec. Doc. 11-1 at 350-351.

[35]     Rec. Doc. 11-1 at 348-350.

[36]     Rec. Doc. 11-1 at 317.

[37]     Rec. Doc. 11-1 at 382-383.

[38]     Rec. Doc. 11-1 at 343-347.

with sleep.  The dosages of Bupropion and Mirtazapine were increased and she was to taper off Zolpidem.  Ms. Alviar noted that the claimant was morbidly obese, clean, appropriately groomed, pleasant, and had a normal gait.  No delusions were revealed or observed and there was no suicidal or homicidal ideation.  Her judgment was fair, her insight was limited, and her attention was good.

On April 13, 2016,[39] clinical psychologist Michael Atkinson of Baton Rouge, Louisiana, completed a mental disorders disability benefits questionnaire for the Veterans Administration regarding the claimant.  He administered several mental health analyses and noted four mental disorder diagnoses.  First, he listed major depressive disorder, severe, chronic.  He explained that the claimant's first episode of severe depression was in 1998-99 when she was unsuccessful in conceiving a child and became depressed, irritable, and angry, which hastened the end of her first marriage.  He noted that she had been chronically and increasingly severely depressed since that time, with depressed mood, anhedonia, social withdrawal, appetite disturbance, sleep disturbance, fatigue, avolition, feelings of hopelessness and worthlessness, and passive suicidal ideation.  The second listed diagnosis was panic disorder.  Dr. Atkinson noted that the claimant reported having at least one panic attack per week, typically when she was in a crowd or around other people,

---

[39]    Rec. Doc. 11-1 at 576-598.

which were accompanied by heart palpitations, sweating, trembling, chest pain, and shortness of breath. The third diagnosis was agoraphobia. Dr. Atkinson noted that the claimant feared being in crowds or with groups of people, she rarely shopped, she found it difficult to attend church, and she isolated herself socially. The fourth diagnosis was generalized anxiety disorder. Dr. Atkinson noted that the claimant worried excessively about many routine things, these worries were present most days, and the claimant found it difficult to control them. Dr. Atkinson noted that these conditions resulted in occupational and social impairment with deficiencies in most areas, such as work, school, family relations, judgment, thinking, or mood. The claimant told Dr. Atkinson that it took a lot of courage for her to do just a little, that getting up and getting dressed took her a lot of time, that she had not cleaned house in a long time, that she did not sleep well, that she spent a lot of time stressing over not having a child and was still seeing a fertility specialist, and that she wished she had friends she could socialize with. Dr. Atkinson noted depressed mood, anxiety, panic attacks more than once a week, near continuous panic or depression, chronic sleep impairment, mild memory loss, flattened affect, impaired judgment, disturbances of motivation and mood, difficulty establishing and maintaining effective work and social relationships, difficulty adjusting to stressful circumstances, suicidal ideation, and intermittent ability to perform the activities of daily living.

On April 14, 2016,[40] May 5, 2016,[41] and May 26, 2016,[42] the claimant returned for counseling at the VA's weight management program.

The claimant again saw Ms. Alviar on May 26, 2016.[43]  The claimant reported that she was still depressed mainly during the day.  Diagnoses of major depression, sleep apnea, and morbid obesity were assigned.  The claimant was off Zolpidem and agreed to a trial of Sertraline.  Ms. Alviar noted that the claimant was morbidly obese, clean, and appropriately groomed with a normal gait.  Her speech was normal in rate and volume, she had good behavioral control, her affect was full in range, congruent, and appropriate to topics, her thought process was goal directed and tight not loose or disorganized, no delusions or passive death wish were revealed or observed, her judgment was fair, her insight was limited, and her attention was good.  The claimant reported that her mood was "okay but still a little depressed."

On June 21, 2016, the claimant again participated in the VA's Move program for weight maintenance.[44]  The claimant reported not being very active due to

---

[40]    Rec. Doc. 11-1 at 342-343.

[41]    Rec. Doc. 11-1 at 340-341.

[42]    Rec. Doc. 11-1 at 336-337.

[43]    Rec. Doc. 11-1 at 331-335.

[44]    Rec. Doc. 11-1 at 330-331.

depression but she also reported eating smaller portions and making better food choices. She was also treated for essential hypertension.[45]

The claimant also saw Ms. Alviar for mental health evaluation on June 21, 2016.[46] She had been seen previously on May 26, 2016 and was started on Sertraline at that time. After having been advised to take the Sertraline in the evening, the claimant reported being less fatigued during the day and her mood had improved. Her appetite and sleep were good, and she denied audio and visual hallucinations as well as suicidal and homicidal ideation. Ms. Alviar noted that the claimant was morbidly obese, clean, and appropriately groomed with a normal gait. Her speech was normal in rate and volume, she had good behavioral control, her affect was full in range, congruent, and appropriate to topics, her thought process was goal directed and not loose or disorganized, no delusions or passive death wish were revealed or observed, her judgment was fair, her insight was limited, and her attention was good. The claimant reported that her mood was better.

On July 12, 2016, the claimant began treating with VA neuropsychologist Dr. Gina Beverly.[47] Dr. Beverly noted that the claimant had previously been diagnosed with depression and had been treating with Dr. Lott. She stated that the claimant

---

[45]    Rec. Doc. 11-1 at 315.

[46]    Rec. Doc. 11-1 at 326-330.

[47]    Rec. Doc. 11-1 at 314-315, 325, 446-447, 492.

11

requested to attend therapy every few months, had agreed to supportive therapy, had a tendency toward pessimism and negative thinking, and denied current suicidal and homicidal ideation.

On July 26, 2016, the claimant again received nutritional counseling through the VA's Move program.[48]

On September 1, 2016,[49] the claimant again saw the physician's assistant, Ms. Alviar. She was feeling discouraged, had trouble sleeping through the night, and admitted to anhedonia and low energy. She denied hallucinations, suicidal ideation, and homicidal ideation. She stated that she still had bad days, including trouble getting up and getting started with her day. The claimant was described as morbidly obese, clean, appropriately groomed, and pleasant, with a normal gait. Her affect was restricted in range, congruent, and appropriate to topics. Her thought process was goal-directed and tight, no delusions were revealed or observed, and she denied suicidal ideation, homicidal ideation, and perceptual disturbances. Her judgment was fair, her insight was limited, and her attention was good.

---

[48]    Rec. Doc. 11-1 at 463-464.

[49]    Rec. Doc. 11-1 at 449-452.

The claimant again saw Dr. Beverly on September 15, 2016.[50]  Her diagnosis was major depressive disorder and she assigned a current GAF score of 55.[51]  They discussed how the claimant needed to be doing things even if she is anxious.  They discussed her depressive symptoms and identified ways to improve the symptoms or decrease the duration of the symptoms.  Dr. Beverly noted that the claimant had been seeing a primary care mental health social worker who was recommending that the claimant see a psychiatrist.  Dr. Beverly agreed with that recommendation.

On September 19, 2016, the claimant was examined by Dr. Bruce L. Craig.[52]  In his opinion, she was "so depressed and anxious that she could not explain how she got in this state of anxiety when I examined her."  He noted that she was taking multiple nerve medicines, had periods of constipation and diarrhea that stopped her from doing any work, and stayed in bed for days at a time.  He listed her diagnoses as:  panic attacks, uncontrolled depression, irritable bowel syndrome, endometriosis

---

[50]    Rec. Doc. 11-1 at 447-449.

[51]    The Global Assessment of Functioning scale is used to rate an individual's "overall psychological functioning."  American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM−IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status.  A GAF score in the 51 to 60 range indicates "moderate symptoms" such as flat affect, circumstantial speech, occasional panic attacks, or moderate difficulty in social, occupational, or school functioning such as conflicts with peers or coworkers.  The GAF scale was omitted from DSM−5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice."  American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM−5") 16 (5th ed. 2013).

[52]    Rec. Doc. 11-1 at 391-393.

pain, degenerative disk disease in her right ankle, degenerative disk disease in multiple joints, uncontrolled hypertension, acid reflux, and sleep apnea. He noted that her VA records "confirm her inability to use her body or mind for gainful employment." He requested that she be given 100% disability.

On October 4, 2016, Kimberly Guy, LCSW, conducted a mental clinical interview with the claimant.[53] She listed the claimant's established medically determined impairments as panic attacks, major depressive disorder, endometriosis, hypertension, irritable bowel syndrome, hypertension, degenerative disk disease right ankle due to ankle sprain while in the military, and degenerative disk disease multiple joint. Ms. Guy noted that the claimant was driven to the appointment by her husband. She was well groomed and appropriately dressed. She made limited eye contact but was cooperative throughout the interview. The claimant's chief complaints were major depression, anxiety attacks, hearing loss, irritable bowel syndrome, and difficulty sleeping. She reported that her hearing loss and ankle injury occurred while she was in the military. She also reported developing severe headaches and stomach problems while in the military. She reported being diagnosed with endometriosis and being placed on fertility medication. She stated that she developed feelings of depression, anxiety, and panic attacks after being

---

[53]    Rec. Doc. 11-1 at 395-401.

discharged from the military. She was taking the following medications: Amlodiphine Besylate, Hydrochlorothiazide, Mirtazaphine, Sertraline HCL, Lubiprostone, Bupropion HCL, Polyethylene Glycol, Alprazolam, and Naproxen. She was using a CPAP machine.

The claimant reported that she was able to independently shower or bathe, dress herself, and comb her hair but sometimes did not want to engage in these activities due to her depression. She could also feed herself. She could drive but preferred not to go out alone because of panic attacks. She wore Depends undergarments due to irritable bowel movement. She reported that she was unable to do housework because of her back and ankle pain. She stated that she did not cook because of pain while standing and walking and also because her memory was poor and she forgot that food was on the fire. She reported shopping as little as possible, about once every three weeks. She reported that she was able to manage household funds and pay bills but this caused stress and anxiety. She reported that being around a lot of people made her nervous and caused panic attacks. She spent most of her time with her husband. They attended church services once or twice per month but usually left before the service was over. The claimant reported that her depression caused her to not want to do anything. She said that her attention span was very short, and she had difficulty following written and spoken instructions due to chronic pain and hearing loss. The claimant reported that she had to stop driving

trucks because medication she was taking made her drowsy and irritable bowel syndrome caused diarrhea.

Ms. Guy noted that the claimant appeared depressed and unhappy but showed no signs of illogical thinking or difficulty with reasoning. Her dialogue and thought content appeared to be normal, with no indications of paranoia, delusion, or hallucination. Her mood was dysphoric and her affect was flat. She appeared attentive with no issues regarding judgment or insight. She was able to attend and maintain focus during the interview. Her long term and immediate memory were unimpaired, while her recent memory was mildly impaired.

Ms. Guy opined that the claimant exhibited the intellectual ability to manage her personal financial affairs. However, she opined that the claimant's ability to relate to coworkers and the public may be limited due to her reported preference of not wanting to be around people. Further, Ms. Guy opined that the claimant's ability to sustain effort and persist at a normal pace in the workplace may be diminished due to symptoms of major depression, anxiety, and her medical problems. Finally, Ms. Guy noted that the claimant's ability to tolerate the stress, pressure, and social environment of a work setting may also be diminished.

On November 15, 2016,[54] the claimant treated for fifty-five minutes with Dr. Beverly.  Dr. Beverly diagnosed her with major depressive disorder (service connected) and again assigned a current GAF score of 55.  Dr. Beverly also noted that the claimant's symptoms were not well managed.  Their discussion focused on the claimant's thinking patterns that largely consisted of negative thoughts and guilt.

On December 11, 2016, the claimant was seen in the emergency room at Lafayette General Medical Center, Lafayette, Louisiana, for an umbilical hernia.[55]

On December 17, 2016, the claimant underwent a disability evaluation performed by Dr. Andriette Fitch.[56]  Dr. Fitch's report is rife with incomplete sentences and internal inconsistencies; it does not appear to have been proofread. The claimant told Dr. Fitch that she was diagnosed with hypertension five years earlier and was taking medication for that condition.  She told Dr. Fitch that she had also been diagnosed with obstructive sleep apnea five years earlier and was using a CPAP machine with much improvement of symptoms.  The claimant reported an ankle sprain in 1997 that progressively worsened, resulting in a constant throbbing and aching pain with associated numbness.  Her pain was allegedly worse when standing and better with elevation and pain medication.  She also reported arthritis

---

[54]     Rec. Doc. 11-1 at 443-446.

[55]     Rec. Doc. 11-1 at 402-408.

[56]     Rec. Doc. 11-1 at 410-418.

in her lower back that resulted in a constant throbbing pain that was worsened by standing and sitting and improved with soaking and lying down. She rated the pain in her ankle and that in her back at nine on a ten point scale. She stated that she was not followed by an orthopedist. The claimant reported having irritable bowel syndrome that was partially relieved with medication and gastroesophageal reflux disease ("GERD.") The claimant gave a history of depression, anxiety, panic attacks, and agoraphobia diagnosed in 2016. She stated that she had not been hospitalized for mental health issues but was seeing a psychiatrist and taking medication. She denied homicidal and suicidal ideation.

The claimant told Dr. Fitch that she had formerly been employed as a truck driver. She estimated that she could walk a block on level ground, could climb less than one flight of stairs, had difficulty standing for more than fifteen minutes, had difficulty lifting more than five pounds with either arm, is unable to drive, sweep, mop, vacuum, cook, wash dishes, mow the grass, or do other yard work. However, she stated that she was able to dress and feed herself. She stated that she can shop for groceries for only about fifteen minutes at a time. The claimant reported surgery for tonsils in 1975, for laparoscopy in 1996, and for gall bladder removal in 2003.

Dr. Fitch noted that the claimant appeared clean and well groomed. She was 5'2" tall and weighed 250 pounds, her BMI was 45, and her blood pressure was 174/95. She was able to get up and out of her chair and on and off the examination

18

table without difficulty.  She walked without difficulty and without an assistive device.  Her gait was normal.  Her hearing was grossly normal.  Dr. Fitch noted both that the claimant was and was not wearing hearing aids.  Straight leg raise tests were negative.  The claimant was able to bend over and touch her toes, walk on her toes, walk on her heels, squat, and perform tandem heel walking.  She had normal strength in both hands and normal gross manipulative skills in both hands.  She had normal reflexes, motor strength, and sensation.  She had normal range of motion in all joints except for her ankles.  It is unclear from the report whether range of motion was limited in both ankles or just the right ankle.  X-rays of the right ankle showed mild hallus valgus (bunion) with mild degenerative changes.

Dr. Fitch opined that the claimant was able to stand only occasionally in an eight hour work day (up to 1/3 of the day), was able to walk frequently during an eight hour work day (1/3 to 2/3 of the day), and had a limited ability to bend or stoop. She noted that the claimant ambulated without difficulty and without using an assistive device.

On December 19, 2016, the claimant's hearing was evaluated by Dr. Joseph A. Guillory, a licensed and certified audiologist.[57]  He found that the claimant had

---

[57]      Rec. Doc. 11-1 at 420-422.

severe bilateral sensorineural hearing loss but he also recommended that she undergo further testing.

On January 17, 2017, the claimant again saw Dr. Beverly for sixty minutes of psychotherapy for her major depressive disorder.[58]  The claimant reported that she continued to struggle with depression and tended to disengage when feeling anxious or depressed, which ended up being much of the time.  She also struggled with infertility and discussed ways that she could cope with this better so that it impacted her mood less.  She agreed to consult with a psychiatrist.

On January 26, 2017, the claimant was seen at the VA in follow up to two recent hospital visits in Lafayette, Louisiana, one for the flu on January 14 and the other for an umbilical hernia in December.[59]  An abdominal binder was requested for the claimant's umbilical hernia.[60]  It was noted that her gait was normal, but also that she had a history of chronic bilateral ankle pain, chronic constipation, depression, and hypertension.  It was also noted that she was a participant in the VA's Move program for weight management.  The claimant indicated that she was pain free and had been pain free for the last seven days.  Her depression was

---

[58]    Rec. Doc. 11-1 at 441-442.

[59]    Rec. Doc. 11-1 at 429-435.

[60]    Rec. Doc. 11-1 at 213.

described as stable, and her hypertension was described as controlled.  On February 23, 2017, she was fitted with the abdominal binder.[61]

On January 26, 2017, the claimant also met with physician's assistant Ms. Alviar for twenty minutes of face-to-face evaluation and ten minutes of psychotherapy.[62]  The claimant indicated that she did not notice much difference after having started taking Sertraline.  She complained about being unable to sleep through the night.   Ms. Alviar described the claimant as morbidly obese, appropriately groomed, pleasant, and smiling with a normal gait.  She noted that the claimant was cooperative, with normal rate and volume of speech.  The claimant reported her mood as "about the same."  Ms. Alviar found that the claimant's affect was restricted in range, congruent, and appropriate to topics, her thought process was goal-directed and tight, no delusions were revealed or observed, she was neither homicidal nor suicidal, her judgment was fair, her insight was limited, and her attention was good.  They discussed the possibility of moving her mental health care to the Lafayette, Louisiana VA clinic, and they discussed the need for the claimant to make lifestyle changes particularly with regard to establishing morning and evening routines, changing clothes every day, and walking outside.  On February 2,

---

[61]      Rec. Doc. 11-1 at 558.

[62]      Rec. Doc. 11-1 at 435-439.

2017,[63] the claimant called Ms. Alviar and reported having GI side effects from the Sertraline; the timing of her medication was modified.  On January 26, 2017, the claimant also received education regarding her CPAP machine.[64]

The claimant was seen again by Dr. Beverly on March 17, 2017.[65]  Her diagnosis was major depressive disorder.  The claimant reported some suicidal or homicidal ideation with no plan or intentions to follow through.  The claimant reported feeling a little better after a medication change.  She discussed her fertility issues and sense of loss centered on that issue.  They discussed how to work on emotionally processing this loss and facilitate healing.  The goal was to decrease depression by engaging in healthy behaviors, decreasing avoidance, and modifying problematic thinking.  The claimant did not show up for an appointment with Dr. Beverly on May 19, 2017.[66]

On June 29, 2017, the claimant again participated in the VA's Move program for weight management.[67]  She was 5'2" tall and weighed 249 pounds.  She indicated that she was struggling with stress, anxiety, and depression and, despite taking

---

[63]    Rec. Doc. 11-1 at 438-439.

[64]    Rec. Doc. 11-1 at 439-440.

[65]    Rec. Doc. 11-1 at 553-554.

[66]    Rec. Doc. 11-1 at 549-550.

[67]    Rec. Doc. 11-1 at 542-543.

medication and engaging in psychotherapy, she did not want to leave her house, be around crowds, exercise, or eat healthy.  She chose not to schedule another Move appointment at that time.

On that same date, the claimant saw Ms. Alviar for mental health evaluation and psychotherapy.[68]  She had previously been seen in January 2017.  Since then, her Sertraline dose was increased, and the claimant reported some slight improvement.  Her sleep and energy were about the same.  She reported that she had stopped exercising, was still isolating, and was not sleeping well.  She denied suicidal or homicidal ideation and also denied audio and visual hallucinations.  Ms. Alviar observed that the claimant was morbidly obese, clean, dressed in casual clothing, pleasant, and smiling with a normal gait.  She was cooperative, her speech displayed a normal rate and volume, her mood was "about the same, maybe slightly better," and her affect was full in range, congruent, and appropriate.  Her judgment was fair, and her insight was limited.  They discussed making lifestyle changes.

On August 2, 2017, the claimant again saw Dr. Beverly for individual supportive therapy for her major depressive disorder.[69]

---

[68]    Rec. Doc. 11-1 at 543-547.

[69]    Rec. Doc. 11-1 at 540-541.

23

The claimant again saw Dr. Angel on September 7, 2017.[70]  Her active problem list was morbid obesity, endometriosis, and depression.  Her prescribed medications were:  Amlodipine Besylate for blood pressure and heart, Bupropion HCL for depression and low energy, Hydrochlorothiazide for blood pressure, Hydroxyzine HCL for panic and anxiety, Mirtazapine for depression, Naproxen for joint pain and inflammation, Polyethylene Glycol for constipation and irritable bowel, Sertraline HCL for depression, Lubiprostone for irritable bowel syndrome, and Vitamin D.  Dr. Angel noted that the claimant's hypertension was under adequate control, she was dieting and had lost several pounds, and her depression was stable with her current medications.

On the same date, the claimant saw Ms. Alviar for a mental health evaluation and psychotherapy.[71]  It was noted that the claimant had a history of major depression and sleep apnea.  The claimant indicated that she was too anxious and paranoid to venture out of her house for more than a few minutes, she had not yet started walking or exercising, but she was taking her medications.  Ms. Alviar encouraged the claimant to make lifestyle changes, including a healthy diet, exercise, and developing a morning and nighttime routine and minimizing daytime naps.  The claimant indicated that she had good days and bad days as well as some days when

---

[70]    Rec. Doc. 11-1 at 530-534.

[71]    Rec. Doc. 11-1 at 534-538.

she slept and some when she did not.  She had no suicidal or homicidal ideation.

Ms. Alviar observed that the claimant was morbidly obese, clean, dressed in casual

clothing and appropriately groomed, pleasant, and smiling with a normal gait.  She

noted that the claimant was cooperative; her speech had a normal rate and volume;

her affect was full, congruent, and appropriate; she had no delusions or passive death

wish; her judgment was fair; her insight was limited; and her attention was good.

No acute, severe psychotic or major mood disorder episode exacerbations were

detected.  She was encouraged to continue psychotherapy with Dr. Beverly.

On December 15, 2017, the claimant again saw Ms. Alviar.[72]  Her key

symptoms were hopelessness, anhedonia, anxiety/panic, and insomnia.  She denied

suicidal ideation and stated that she had a good support system but indicated that the

holiday season was rough.  After her appointment in September, she had called Ms.

Alviar and requested an increased dosage of Sertraline.  The dose was increased, and

the claimant reported mild improvement but she was still depressed, having a hard

time getting up and going, and was not looking forward to the holidays.  She had not

been using her CPAP machine at night and was fatigued during the day.  Buspirone

was prescribed for anxiety.  Lifestyle changes were encouraged.  Ms. Alviar noted

that the claimant was morbidly obese, clean, dressed in casual clothing, pleasant,

---

[72]     Rec. Doc. 11-1 at 565-570.

and smiling with a normal gait.  No delusions were revealed or observed.  Her judgment was fair, her insight was limited, and her attention was good.

On December 19, 2017, the claimant saw Dr. Beverly for individual supportive therapy.[73]  The claimant reported that she was doing poorly and continued to be anxious and depressed, which significantly decreased her activities, and stated that she tended to stay in bed.  They discussed the relationship between emotional and physical health, and Dr. Beverly encouraged the claimant to do less negative thinking, pay more attention to the positive things in her life, and engage in more activities.  The claimant reported that she was hearing voices, including a baby crying, which was significant because of the claimant's inability to become pregnant.  The treatment goal was to better manage emotional symptoms by changing problematic thinking and engaging in health behaviors.

On March 5, 2018, the claimant testified at a hearing regarding her symptoms and her medical treatment.[74]  She stated that she had never been hospitalized for depression or anxiety but was seeing a mental health counselor every two to three months and was transitioning to a different psychiatrist.  She testified that her symptoms included panic attacks, nervousness, and being emotional.  She stated that crowds and noise triggered her panic attacks.  She described her panic attacks as

---

[73]      Rec. Doc. 11-1 at 563-564.

[74]      Rec. Doc. 11-1 at 93-122.

everything going blank, being unable to catch her breath, and feeling like she was going to have a heart attack. She estimated that she had about four panic attacks per week. She stated that taking Sertraline and Hydroxaline for depression and anxiety gave her slight relief but caused dizziness, drowsiness, and fatigue. She described trouble staying focused and paying attention. Additionally, she testified that she began hearing voices in December 2017, which is why her doctor was sending her to a different psychiatrist. She admitted that she isolated herself and had emotional outbursts. She said that she had trouble following directions and admitted having difficulty getting out of bed due to both depression and her physical problems.

With regard to physical impairments, the claimant testified that joint pains in her back, stomach problems, and a hernia condition prevent her from working. She stated that she took Naproxen for back pain. She said that hernia surgery had been recommended but she was scared of proceeding with the surgery. She testified that she was 5'2" tall and weighed 230 pounds. She stated that she took medication for hypertension. She also stated that she had trouble sleeping and used a CPAP machine every night. She stated that she wore hearing aids in both ears. She testified that she used a cane that was prescribed for her because she had been falling due to weakness in her ankles and knees. She stated that she also wore an ankle support device. She denied being able to lift a gallon of milk, stated that she could sit for thirty minutes to an hour before needing to stand up, and could stand for about five

minutes before needing to take a break.  She denied having problems with her hands.  Finally, the claimant explained that she had endometriosis that prevented her from becoming pregnant and was a source of her depression.

The claimant explained that she worked for about seven years as a commercial truck driver, driving semis along with her husband.  She stated that she stopped working as a truck driver because she was panicking while driving and forgetting things, such as driving directions, which she attributed to worsening depression.

On May 15, 2018, the claimant was seen by psychiatrist Charlotte N. Hutton at the VA.  The claimant reported that she had stopped working in 2015 after her emotional and physical pain worsened.  She reported worsening flashbacks of a drill sergeant yelling in her face, losing track of time, and often finding that she had driven to a location but did not know where she was.  She reported auditory hallucinations in the preceding month, including hearing her mother's voice reassuring her and voices yelling at her.  She did not have a plan to kill herself but had thoughts of dying.  She endorsed thoughts of being better off dead or hurting herself more than half the days, and she reported that her quality of life was extremely difficult.  She reported migraine headaches and endometriosis.  She reported no hospitalizations for psychiatric problems and no suicide attempts.  Dr. Hutton noted that the claimant had a flat stare without internal stimulation or response, psychomotor agitation in the form of shaking at times, an anxious mood, a guarded affect, flat range, deliberate

aprosody[75] speech, and no aberration in thought form or process. The claimant reported that she was unable to focus and had days in which she ate and days in which she did not eat. She reported anxiety all the time. Her cognitive functioning was intact, her judgment was not impaired, and no impulsivity was observed. Her medications were adjusted.

The claimant saw Dr. Hutton again on May 16, 2018.[76] The diagnoses were Mood Disorder, PTSD, Cluster B Personality Disorder, and Psychotic Disorder. The key symptom was hopelessness. Stressors and interpersonal difficulties were noted to be health status deteriorating, chronic medical illness, social isolation, thwarted belongingness, perceived burdensomeness, and verbal abuse in the military. She had no present intent to kill herself.

The claimant returned to Dr. Hutton on June 14, 2018. The claimant reported that she was not feeling any different. She was paranoid, hearing a crying baby, having difficulty with focus and attention, and not sleeping. Her medications were adjusted. Dr. Hutton observed that the claimant was alert and tidy, she walked with a cane, she had no involuntary movements, her mood was depressed, her affect was flat and helpless, her range was blunted, her speech was low in tone, her thought form was mildly perserverative about the voices she was hearing, but there were no

---

[75]     The lack of variations in speech, such as speed, tone, and emphasis.

[76]     Rec. Doc. 11-1 at 32-33.

aberrations in her thought process. The claimant described her quality of life as extremely difficult and reported thoughts of suicide on more than half of days. Her cognitive function and judgment were intact, and no impulsivity was reported or observed. Dr. Hutton discussed the claimant's condition with her and again adjusted her medications.

The claimant returned to see Dr. Hutton on July 20, 2018.[77] The claimant reported continued difficulty sleeping and stated that she was still hearing a baby crying and the sergeant's voice. Dr. Hutton observed that the claimant was alert, tidy in appearance, walked with a cane, had good behavior control, and had no involuntary movements. Her mood was angry, her range was blunted, her speech was fluent with a normal tone and volume. There was no aberration in her thought form or process. The claimant focused on not sleeping and was struggling with why she had to see so many health care providers. She had stopped seeing a psychologist even though Dr. Hutton had advised that she needed to see both a psychiatrist and a psychologist. Dr. Hutton noted that the claimant's judgment was mildly impaired. Dr. Hutton spoke with the claimant and her husband and explained that the claimant had numerous psychiatric issues. The claimant's husband was surprised at the number of problems his wife had. Dr. Hutton also explained that the claimant should

---

[77]    Rec. Doc. 11-1 at 22-26.

be seeing a therapist, a psychiatrist, and also engaging in a day treatment program. Dr. Hutton assigned the following diagnoses:  Borderline Personality Disorder, Dependent Personality Disorder, insomnia due to another mental illness, dysthymia, Chronic Posttraumatic Stress Disorder, Major Depressive Disorder with psychotic features, and obesity.

The claimant now seeks reversal of the Commissioner's adverse decision.

## Analysis

### A.  Standard of Review

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[78]  "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[79]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[80]

---

[78]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[79]      *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[80]      *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[81]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[82]  Conflicts in the evidence[83] and credibility assessments[84] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[85]

## B.    <u>Entitlement to Benefits</u>

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[86]  A person is disabled "if he is

---

[81]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[82]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[83]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[84]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[85]    *Wren v. Sullivan*, 925 F.2d at 126.

[86]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[87]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[88]

## C.    **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled.  The Commissioner must determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[89]

---

[87]     42 U.S.C. § 1382c(a)(3)(A).

[88]     42 U.S.C. § 1382c(a)(3)(B).

[89]     20 C.F.R. § 404.1520.

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[90] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[91]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[92]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[93]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[94]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[90]     20 C.F.R. § 404.1520(a)(4).

[91]     20 C.F.R. § 404.1545(a)(1).

[92]     20 C.F.R. § 404.1520(e).

[93]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[94]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[95]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[96]

**D.    <u>The ALJ's Findings and Conclusions</u>**

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since October 22, 2015.[97]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  degenerative joint disease, tinnitus, hypertension, obesity, depression disorder, anxiety disorder, and obstructive sleep apnea.[98]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[99]  The claimant did not challenge this finding.

The ALJ found that the claimant has the residual functional capacity to perform light work except that she can only occasionally kneel, stoop, crouch, crawl,

---

[95]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[96]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[97]    Rec. Doc. 11-1 at 67.

[98]    Rec. Doc. 11-1 at 68.

[99]    Rec. Doc. 11-1 at 68.

climb ramps, and climb stairs, and can never climb ladders, ropes, or scaffolds. The ALJ further found that the claimant must avoid moderate exposure to loud noises and is limited to unskilled work requiring only occasional interaction with the general public and coworkers.[100]  The claimant challenged this finding.

At step four, the ALJ found that the claimant is not capable of performing her past relevant work.[101]  The claimant did not challenge this finding.

At step five, the ALJ found that the claimant was not disabled from October 22, 2015 through May 8, 2018 (the date of the decision) because there are jobs in the national economy that she can perform.  The claimant challenged this finding.

## E.    The Allegations of Error

The claimant contends that the ALJ erred (1) in improperly evaluating the medical opinion evidence; and (2) in improperly evaluating the finding of the Department of Veterans Affairs that the claimant is 100% disabled due to depression and anxiety.

## F.    Did the ALJ Err in Evaluating the Medical Opinion Evidence?

An ALJ is required to consider all of the record evidence.[102]  The claimant contends, however, that the ALJ failed to properly consider the opinions of Dr.

---

[100]    Rec. Doc. 11-1 at 70.

[101]    Rec. Doc. 11-1 at 76.

[102]    *Loza v. Apfel*, 210 F.3d 378, 393 (5th Cir. 2000).

Michael Atkinson.  Dr. Atkinson, a licensed psychologist, examined the claimant on April 13, 2016, at the request of the Veterans Administration.  Dr. Atkinson opined that the claimant had difficulty in adapting to stressful circumstances, including work or a work-like setting, had difficulty in establishing and maintaining effective work and social relationships, and had an intermittent inability to perform activities of daily living.[103]

The ALJ gave "little weight" to Dr. Atkinson's opinions "because it is not given in terms recognized by the Social Security Administration and it is inconsistent with the evidence of record.  Further, the social security program utilizes different criteria to determine disability than the criteria used by the Veterans Administration."[104]  Had Dr. Atkinson rendered an ultimate opinion concerning the claimant's disability, it would have been appropriate for the ALJ to note that the VA and the Social Security Administration use different criteria to determine whether a person is disabled.  But noting this distinction is not a valid basis for ignoring Dr. Atkinson's findings, particularly since he did not express an opinion as to whether the claimant is or is not capable of returning to the work force.  Dr. Atkinson's opinions are germane to the ALJ's decision-making process and should have been considered along with the other evidence in the record.

---

[103]    Rec. Doc. 11-1 at 584.

[104]    Rec. Doc. 11-1 at 74-75.

Dr. Atkinson conducted an in-depth interview of the claimant and administered several tests including a Patient Health Questionnaire, a Physical Symptoms Questionnaire, the PHQ Depression Seale, the PQH Generalized Anxiety Disorder Measure, and the Mini International Neuropsychiatric Interview. He reviewed the claimant's VA medical records file and observed her demeanor. Therefore, his opinions were based on a combination of objective and subjective information. But the ALJ failed to consider or discuss Dr. Atkinson's testing, examination, and observation of the claimant. This was a failure to consider all of the evidence in the record.

The ALJ also stated, in a conclusory fashion, that Dr. Atkinson's opinions were inconsistent with the evidence in the record. But the ALJ did not compare Dr. Atkinson's findings against other evidence in the record or identify any way in which the information set forth in Dr. Atkinson's report was inconsistent with any other evidence. Had the ALJ done so, she might have found that Dr. Atkinson's opinions were supported by the frequent need for psychotherapy documented in the record and also consistent with the prescription of psychoactive medication over a significant period of time to address the claimant's symptoms, which was also documented in the record (including the modification of dosages of existing medications, the addition of new medications, and the termination of some prescriptions). The history provided by the claimant to Dr. Atkinson was consistent

with the history she gave to other health care providers, and the diagnoses reached by Dr. Atkinson mirror those of other health care providers.  Therefore, the ALJ's conclusion that Dr. Atkinson's opinions are inconsistent with the evidence in the record is not supported by substantial evidence, and the ALJ consequently did not give a valid reason for assigning little weight to Dr. Atkinson's opinions.  The ALJ's rejection of Dr. Atkinson's opinions on the stated bases constituted error.

## G.   Did the ALJ Err in Evaluating the VA's Disability Finding?

In her decision, the ALJ stated that, in October 2017, the Veterans Administration increased the claimant's service-connected disability to 100% due to the claimant's major depressive disorder.  This statement is erroneous, and it was based on a misreading of a medical record having to do with the claimant's request for dental services on October 10, 2017.[105]   Actually, the VA increased the claimant's disability rating from 70% to 100% effective April 8, 2015 due to major depressive disorder, panic disorder, agoraphobia, and generalized anxiety disorder.[106]   In her decision, the ALJ further noted that "the Social Security Administration is not bound by disability opinions from other agencies."[107]  The ALJ did not evaluate the VA's disability rating or state how much weight, if any, she

---

[105]   Rec. Doc. 11-1 at 514.

[106]   Rec. Doc. 11-1 at 207-209.

[107]   Rec. Doc. 11-1 at 75.

gave to the VA's disability rating.  Further, she gave no reason for failing to assign any weight to the VA's disability rating other than the fact that she was not bound by the VA's rating.  This was reversible error.

A disability rating from the VA is generally entitled to great weight, and an ALJ must consider such a rating in reaching his or her decision.[108]  The weight assigned to such a determination will vary depending upon the factual circumstances of each case.[109]  An ALJ need not give great weight to a VA disability determination if the ALJ adequately explains valid reasons for not doing so.[110]  But simply noting that the VA's disability determination is not binding on the Commissioner is not a valid reason for rejecting a VA disability rating; instead, an ALJ must provide specific reasons for not giving great weight to the VA's disability determination.[111]  This is so because SSR 06-03p instructs that an ALJ is

> required to evaluate all the evidence in the case record that may have a bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies.... Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered.... [T]he adjudicator should explain the consideration given to these

---

[108]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001).

[109]    *Garcia v. Berryhill*, 880 F.3d 700, 705 (5th Cir. 2018) (citing *Chambliss v. Massanari*, 269 F.3d at 522).

[110]    *Chambliss v. Massanari*, 269 F.3d at 522.

[111]    *Chambliss v. Massanari*, 269 F.3d at 522-23.

decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases.[112]

Accordingly, an ALJ cannot disregard a disability rating from the VA on the basis that VA disability determinations are not binding on the Commissioner.[113]  An ALJ must consider the VA's disability rating, just as he or she considers the other evidence in the case, and give it the amount of weight appropriate under the circumstances.  A failure to consider the VA's disability rating is reversible error.[114]

In this case, there is no indication that the ALJ scrutinized the VA's assignment of a disability rating for the claimant's mental health disorders or gave the rating any meaningful consideration.  To the contrary, the ALJ merely mentioned the VA's disability rating and stated that it was not binding.  Indeed, the Commissioner admitted in briefing that "the ALJ explained that she was not bound by [the VA's] rating. . . [and] the ALJ did not provide further reasons for rejecting this VA disability rating."[115]  Therefore, the ALJ did not apply the proper legal standard.  An ALJ fails to apply the proper legal standard when she fails to consider

---

[112]    Social Security Ruling, SSR 06–03p., 2006 WL 2263437.

[113]    See, e.g., *Stacy G. D. v. Berryhill*, No. 3:18-H-CV-0204-BH, 2019 WL 1315890, at *9 (N.D. Tex. Mar. 22, 2019).

[114]    See, e.g., *Stacy G. D. v. Berryhill*, 2019 WL 1315890, at *10; *Elie v. U.S. Commissioner of Social Security Administration*, No. 1:15-CV-01661, 2016 WL 7735298, at *10 (W.D. La. Aug. 29, 2016), report and recommendation adopted, 2017 WL 104442 (W.D. La. Jan. 10, 2017); *McCaa v. Astrue*, No. 09-72-SCR, 2010 WL 1533287, at *5 (M.D. La. Apr. 14, 2010).

[115]    Rec. Doc. 15 at 9.

a VA disability rating and explain her reasons for discounting it.[116] "The failure to follow this rule is legal error requiring reversal."[117]

A failure to apply the correct legal standard is a legal error, not a procedural error.[118] The Fifth Circuit has instructed that when the Commissioner "has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial."[119] Therefore, in light of the ALJ's legal error, this case should be remanded to the Commissioner with instructions to apply the correct legal standard by fully considering the VA's disability rating, giving it the amount of weight it is entitled to under the circumstances, and explaining why that amount of weight was appropriate.

---

[116]   See, e.g., *Rasco v. Berryhill*, No. 4:17-CV-946, 2018 WL 587948, at *4 (S.D. Tex. Jan. 5, 2018), report and recommendation adopted, 2018 WL 560400 (S.D. Tex Jan. 25, 2018)

[117]   *Albo v. Colvin*, No. 2:12-CV-0066, 2013 WL 5526584, at *7 (N.D. Tex. Sept. 30, 2013); *Rich v. Astrue*, No. 3–10–CV–2064, 2011 WL 6606651, at *3 (N.D. Tex. Dec. 22, 2011).

[118]   See *Stacy G. D. v. Berryhill*, 2019 WL 1315890, at *10; *Ayala v. Berryhill*, No. 4:17-CV-00783-O-BP, 2018 WL 1470626, at *5 (N.D. Tex. Mar. 8, 2018) ("Harmless error analysis does not apply to an ALJ's failure to consider and weigh the VA's disability rating."), report and recommendation adopted, 2018 WL 1457246 (N.D. Tex. Mar. 23, 2018); *Rasco v. Berryhill*, 2018 WL 587948, at *4 ("the failure of the ALJ to consider the VA's disability determination is the type of legal error that is not subject to the harmless error analysis as the Court cannot try issues de novo, reweigh the evidence, nor substitute its findings for those of the Commissioner." (citations omitted)).

[119]   *Moore v. Sullivan*, 895 F.2d 1065, 1070 (5th Cir. 1990) (quoting *Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989)).  See, also, *Stone v. Heckler*, 752 F.2d 1099, 1106 (5th Cir. 1985) ("Unless the correct standard is used, the claim must be remanded to the [Commissioner] for reconsideration.").

## Conclusion and Recommendation

For the reasons fully set forth above, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to consider and properly weigh all of the evidence in the record, including but not limited to Dr. Atkinson's opinions and the VA's disability rating, and to apply the proper legal standard for evaluating the VA's disability rating.  The claimant shall be permitted to submit updated medical evidence and to testify at another hearing, if desired. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[120]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

---

[120]     See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[121]

Signed in Lafayette, Louisiana, this 1st day of August 2019.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[121]     See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).

44